******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CAPITAL FOR CHANGE, INC. *v.* BOARD OF ASSESSMENT APPEALS OF THE TOWN OF WALLINGFORD
## (AC 44404)

Alvord, Prescott and DiPentima, Js.

*Syllabus*

The plaintiff appealed to the trial court from the decision by the defendant board of assessment appeals upholding the denial of the plaintiff's application for a charitable organization real property tax exemption pursuant to statute (§ 12-81 (7)). The plaintiff, a tax-exempt charitable organization for federal tax purposes, used the subject property to engage in commercial lending, consumer lending, loan servicing and third-party contract administration. The plaintiff provided to developers and homeowners financial services, inter alia, to improve and increase the supply of affordable housing and, through a subsidiary, contracted with utility companies to administer energy efficient loan programs. The trial court rendered judgment dismissing the appeal from the board's decision, and the plaintiff appealed to this court, claiming that the trial court improperly concluded that, because it is not organized exclusively and the property is not used exclusively for charitable purposes, the property is not tax-exempt pursuant to § 12-81 (7). *Held* that the trial court properly dismissed the plaintiff's appeal from the board's decision: pursuant to § 12-81 (7) and as required by the test set forth in *Isaiah 61:1*, *Inc.* v. *Bridgeport* (270 Conn. 69), and further explicated in *St. Joseph's Living Center*, *Inc.* v. *Windham* (290 Conn. 695), for a property to receive a charitable tax-exempt status, it must be owned by or be held in trust for a corporation organized exclusively for charitable purposes and used exclusively for carrying out one or more of such purposes, and the undisputed evidence demonstrated that the subject property was not used exclusively for charitable purposes as the plaintiff's activities involved in administering energy efficient loan programs at the subject property, including marketing, intake and processing of applications, reporting to investors, and collecting delinquent accounts for utility companies, benefited consumers, commercial entities and industrial customers without the imposition of income limitations and any demonstration of financial need and, thus, were not charitable.

Argued May 25—officially released October 11, 2022

*Procedural History*

Appeal from the decision of the defendant affirming the decision of the defendant's tax assessor denying the plaintiff's application for a charitable tax exemption with respect to certain real property, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Hon. Jon C. Blue*, judge trial referee; judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed.*

*Lori Welch-Rubin*, with whom was *J. Michael Sulzbach*, for the appellant (plaintiff).

*Janis M. Small*, corporation counsel, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, Capital for Change, Inc., appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant, the Board of Assessment Appeals of the Town of Wallingford (board), which upheld the denial of the plaintiff's application for a charitable organization real property tax exemption. On appeal, the plaintiff claims that the court improperly concluded that the plaintiff's property is not exempt pursuant to General Statutes § 12-81 (7) because its mission to support affordable housing for low and moderate income persons is not a charitable purpose and, therefore, it is not organized exclusively, and its property is not used exclusively, for carrying out charitable purposes. We affirm the judgment of the trial court on the ground that, regardless of whether the plaintiff's mission to support affordable housing is a charitable purpose, the undisputed evidence demonstrates that the plaintiff's property is not used *exclusively* for such a purpose, as required to qualify for the exemption.

The following facts, as stipulated by the parties or undisputed in the record, and procedural history are relevant to our resolution of this appeal. The plaintiff, a community development financial institution, is a tax-exempt charitable organization for federal tax purposes that owns real property located at 10 Alexander Drive (property) in Wallingford. The plaintiff uses the property to engage in commercial lending, consumer lending, loan servicing, and third-party contract administration. The plaintiff primarily provides its services to (1) developers and homeowners "to improve and increase the supply of housing affordable to Connecticut residents," (2) consumers, commercial entities and industrial customers, including utility companies, related to the administration of energy efficiency loans, and (3) nonprofits, small businesses, and municipalities.[1]

The plaintiff provides "flexible financing" for the development of affordable housing through its social impact investment program. With that program, investors "are seeking to obtain not just a financial yield on their investment, but they want to see that the activity they're funding has . . . other social impact[s]." In addition to the return on their investments, therefore, the investors receive a report from the plaintiff on the different impacts associated with the plaintiff's lending activities. The investments are "[l]ow return to the investor" but also "[low] cost to [the plaintiff]." In addition, numerous banks lend money to the plaintiff. The plaintiff, in turn, makes loans to consumers and commercial entities to use toward the acquisition, construction and/or renovation of affordable housing.[2] Some of the banks require a direct assignment of the loans made by the plaintiff with their funds. In those circumstances, the plaintiff services the loan for the bank. The plain-

tiff's loan servicing for these banks, and other lenders, consists of payment processing, principal and interest disbursement, default management, and debt collection.[3]

In addition to its services related to the development of affordable housing, the plaintiff also is involved in providing financial services for certain energy efficiency loan programs. The plaintiff created its sole member subsidiary, CT Energy Efficiency Finance Company (CEEF Co.), to "develop and finance clean energy, energy conservation and load management, and energy efficiency projects."[4] CEEF Co. contracts with utility companies, specifically, Eversource and Avangrid, to help oversee statutorily mandated programs such as Home Energy Solutions, the Energize CT Heat Loan program, and the Energy Conservation Loan program.[5] The programs are essentially "self funded revolving loan fund[s]," in that they are funded by the utility companies' customers, i.e., the ratepayers, through mandatory charges added to their utility distribution fees. The utility companies collect the mandatory ratepayer fees and forward them to CEEF Co. to administer the energy efficiency loan programs. The energy efficiency loans funded through these programs are made to consumers, commercial entities, and industrial customers.

"CEEF Co. . . . has no employees. They contract with [the plaintiff] to do the work. [The plaintiff] provides all administrative services to its sole member subsidiary in the execution of CEEF Co.'s contracted services to Eversource. Reimbursement is provided by scheduled, contracted fees for service. [The plaintiff] performs various duties in consumer lending, loan servicing and finance and administration for CEEF Co. These services are contracted under fee for services agreements executed by and between [the plaintiff], CEEF Co., Eversource and Avangrid. These services include marketing, intake and processing of applications, managing a contractor network to provide services, monitoring work completion, funding loans, receiving payments, reimbursing funding sources, reporting to funders, and collections of delinquent accounts. [The plaintiff] also provides on bill repayment (OBR) services to Eversource for these loans. OBR is shadow accounting of loan payments invoiced through the utility's distribution bills and collected by the utilities. Current agreement terms provide a closed loan origination fee, a monthly per loan servicing fee, and an annual fee to administer periodic financial reporting, audits, obtain insurances, and other required administrative services." The plaintiff is compensated for its services to CEEF Co. "under fee for services agreements that stipulate either per item charges (e.g., closed/funded loan, serviced loan/month) or set amounts for monthly administrative costs/reimbursements (e.g., accounting/reporting, insurances, audit)."

Apart from its services related to affordable housing and energy efficiency loans, the plaintiff also provides certain financial services to small businesses, nonprofits, and municipalities. For small businesses, the plaintiff "work[s] with all the micro lenders around the state to have accelerator training programs for early stage businesses to help grow them and . . . to provide them capital to be able to help those businesses get launched . . . and to grow."[6] For nonprofits, the plaintiff offers "bridge loans to provide interim capital where there's . . . a funding obligation [from a third party] that's going to be delivered at some point in time," which "help[s] smooth the operational expenses of the nonprofits." The plaintiff offers loan servicing to nonprofits such as Habitat for Humanity and other neighborhood housing services "that are smaller [and] do some lending [but] don't have the ability . . . to do debt collection and don't have the adequate systems to do it accurately so they outsource it to [the plaintiff]." The plaintiff also provides loan servicing to municipalities such as the towns of Rocky Hill, Enfield, West Hartford, and the city of Norwalk.

In 2018, the plaintiff filed an application for a tax exemption with respect to the property pursuant to § 12-81 (7). The assessor for the town of Wallingford denied the plaintiff's application, and the plaintiff filed an appeal with the board. The board denied the plaintiff's appeal, and the plaintiff subsequently filed the present action in the Superior Court, appealing from the board's decision.

During a trial to the court, the plaintiff presented testimony from its president and chief executive officer, Calvin Vinal. The parties stipulated to certain undisputed facts and offered several documents as exhibits, including the plaintiff's and CEEF Co.'s foundational documents, certain federal tax forms, and summaries of the plaintiff's loan products, which the court admitted into evidence.

On November 2, 2020, the court issued a memorandum of decision dismissing the plaintiff's appeal from the board's decision. At the outset, the court recognized that "[t]here is no genuine issue as to any material fact. The parties differ on the proper characterization of that evidence and the application of . . . § 12-81 (7) to the facts established by the evidence."

In its analysis, the court first focused on certain language set forth in § 12-81 (7) (B),[7] specifically, that "housing for persons or families of low and moderate income shall not constitute a charitable purpose under this section." [8] The court explained its view that "[s]ubsection (B) makes the statutory term 'charitable purposes' a term of art for purposes of . . . § 12-81. No matter how 'charitable' a purpose might be in common parlance—or, for that matter, for purposes of the Inter-

nal Revenue Code—'housing for persons or families of low and moderate income shall not constitute a charitable purpose *under this section.*' . . . The term 'section' facially applies to the entire text of [§] 12-81. A fortiori, it applies to subsection (7), paragraph (A) of that section. The statutory text is unambiguous." (Emphasis in original.)

The court then focused on the following relevant language set forth in § 12-81 (7) (A): "[T]he real property of . . . a corporation organized exclusively for . . . charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes . . . ." The court determined that "[t]he repeated use of the word 'exclusively' in subsection [7] (A) has independent significance. For its property to be exempt from taxation, a corporation must be 'organized exclusively' for 'charitable purposes.' The property must also be 'used exclusively' for charitable purposes. This means that if a corporation is organized exclusively for multiple charitable purposes (in the common parlance), but one of those purposes is housing for persons or families of low and moderate income, the corporation is not 'organized exclusively' for 'charitable purposes' within the meaning of subsection [7] (A). Similarly, if real property is used exclusively for charitable purposes (in the common parlance), but one of those purposes is housing for families of low and moderate income, the real property is not 'used exclusively' for 'charitable purposes' within the meaning of subsection [7] (A)."

On the basis of its interpretation of § 12-81 (7), the court determined that the plaintiff failed to meet the first two prongs of the test first set forth by our Supreme Court in *Isaiah 61:1, Inc.* v. *Bridgeport*, 270 Conn. 69, 851 A.2d 277 (2004) (*Isaiah 61:1*), and further elucidated in *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 966 A.2d 188 (2009) (*St. Joseph's*), utilized to determine entitlement to a charitable organization property tax exemption, and, accordingly, dismissed the plaintiff's appeal.[9] The plaintiff filed a motion to reargue, which the court summarily denied. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth the applicable standard of review. "The scope of the charitable exemption in § 12-81 (7) is a question of statutory construction, over which we exercise plenary review."[10] *Rainbow Housing Corp.* v. *Cromwell*, 340 Conn. 501, 511, 264 A.3d 532 (2021). Our review of the plaintiff's claim also is informed by the "rule of strict construction applicable to statutory provisions granting tax exemptions." Id., 511–12. "It is . . . well established that in taxation cases . . . provisions granting a tax exemption are to be construed strictly against the party claiming the exemption, who bears the burden of proving entitlement to it. . . .

Exemptions, no matter how meritorious, are of grace . . . . [Therefore] [t]hey embrace only what is strictly within their terms. . . . We strictly construe such statutory exemptions because [e]xemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. . . . [I]t is also true, however, that such strict construction neither requires nor permits the contravention of the true intent and purpose of the statute as expressed in the language used." (Citations omitted; internal quotation marks omitted.) *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 707.

In order to qualify for an exemption under the relevant portions of § 12-81 (7) (A), the property must be owned by, or held in trust for, "a corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes," and no "officer, member or employee" may "receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes . . . ." General Statutes § 12-81 (7) (A). Subdivision (B) of § 12-81 (7) "creates an exclusion to this tax exemption for housing subsidized, in whole or in part, by federal, state or local government and housing for persons or families of low and moderate income" by providing that such housing "shall not constitute a charitable purpose under this section," but it also "carves out an exception to this exclusion for five specified categories of temporary housing." (Internal quotation marks omitted.) *Rainbow Housing Corp.* v. *Cromwell*, supra, 340 Conn. 513; see footnote 7 of this opinion.

On the basis of the foregoing statutory language, our Supreme Court set forth a five-pronged test in *Isaiah 61:1* that must be satisfied in order for property to qualify for tax exemption under § 12-81 (7). "[T]he property must: (1) belong to or be held in trust for a corporation organized exclusively for charitable purposes; (2) be used exclusively for carrying out such charitable purposes; (3) not be leased, rented or otherwise used for a purpose other than the furtherance of its charitable purposes; (4) not be housing subsidized by the government; and (5) not constitute low or moderate income housing." *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 77.

In the present case, like the trial court, we confine our analysis to the first two prongs of *Isaiah 61:1*, which "precisely track the statutory language"; *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 709; and were further explicated by our Supreme Court in *St. Joseph's*.[11] We address each prong in turn.

I

The first prong set forth in *Isaiah 61:1* for a property to receive tax-exempt status under § 12-81 (7) is that the property must "belong to or be held in trust for a corporation organized exclusively for charitable purposes . . . ." *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 77. In *St. Joseph's*, our Supreme Court explained: "We consider three factors in making this determination. The first, and most important, factor requires an examination of the corporate entity itself to determine if it is organized to carry out an exclusively charitable purpose. The second factor that we previously have considered, to a lesser extent, is whether an entity claiming charitable status for tax exemption purposes is self-supporting. The third factor asks whether an organization's activities serve to relieve a burden on the state."[12] *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 713.

"The first [factor]—whether a corporation is organized exclusively for charitable purposes—can be broken into two parts." Id. "First, we must determine for what purposes a particular corporation has been 'organized' . . . by examining the entity's foundational documents," such as its charter, certificate of incorporation, or bylaws. (Footnote omitted.) Id., 713–14; see also *Rainbow Housing Corp.* v. *Cromwell*, supra, 340 Conn. 518 n.9. "We then must decide whether that purpose is, in fact, 'charitable.' " *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 713.

"The modern approach to defining a charitable use or purpose is rather broad and liberal." Id., 715. "The definition of a charitable use or purpose is not restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. . . . Thus, [c]harity embraces anything that tends to promote the well-doing and the well-being of social man." (Citation omitted; internal quotation marks omitted.) *Rainbow Housing Corp.* v. *Cromwell*, supra, 340 Conn. 513.

Under the second factor set forth in *St. Joseph's*, we consider whether the plaintiff is self-supporting. "[I]n order to serve a charitable purpose, an organization must not be completely self-supporting." *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 721. "In other words, to constitute a charitable organization, the entity must be structured in such a way that it is intended to function with the aid of at least some private charitable support and must, in fact, seek out and receive such support." Id., 723.

The third factor requires that we consider "whether the organization's activities relieve the state of a burden

it otherwise would be compelled to bear." Id., 729–30. "[Exemptions] are granted in aid of the accomplishment of a public benefit and for the advancement of the public interest. It is in recognition of their position as an agency in the doing of things which the public, in the performance of its governmental duties, would otherwise be called upon to do at its own expense, or which ought to be done in the public interest and without private intervention would remain undone. . . . This requirement compels an organization . . . to give something to the state in return for the privilege, either by relieving it of a financial burden or by pursuing a publicly mandated moral obligation." (Citations omitted; internal quotation marks omitted.) Id., 730–31.

Turning to the facts of the present case, the plaintiff's purpose, as set forth in its restated certificate of incorporation and repeated in its bylaws, is: "a. To provide financial products and services to support activities that primarily benefit low and moderate income persons and geographies, and minority and otherwise underserved individuals and businesses;

"b. To promote economic and community development, improve economic conditions and economic opportunities, increase and preserve affordable housing options, promote energy efficiency and use of alternative energy, and improve access to health, food and educational resources and other services benefitting low-and moderate-income persons and geographies;

"c. To lessen the burdens of local, state and federal governments, generally;

"d. To solicit, accept, hold, invest, reinvest and administer any contributions, grants, investments, donations, gifts, bequests, devises, benefits of trusts (but not act as trustee of any trust), and property of any sort, without limitation as to amount or value, and to use, disburse or donate the income or principal thereof for exclusively charitable, scientific and educational purposes in such manner as, in the judgment of the Board of Directors of the Corporation (the 'Board') will best promote the purposes of the Corporation; and

"e. To contract for, purchase, receive, develop, own, manage, operate or lease property, real, personal and mixed, to employ or otherwise retain such persons and to borrow funds as may be necessary to promote and further the purposes and objectives of the Corporation." (Emphasis omitted.)

The trial court, in considering whether the plaintiff is "a corporation organized exclusively for charitable purposes" under *Isaiah 61:1*'s first prong, examined the plaintiff's foundational documents and found that "an important foundational purpose of [the plaintiff] is to provide housing for persons or families of low and moderate income." The court determined that "[the plaintiff] is not self-supporting and . . . its activities

serve to relieve a burden on the state" but that, on the basis of its interpretation of the "housing" exclusion set forth in § 12-81 (7) (B), "the first *St. Joseph's* factor is not established by the evidence. [The plaintiff] is not organized to carry out an *exclusively* charitable purpose." (Emphasis in original.) Accordingly, it concluded that the plaintiff did not satisfy the first prong of *Isaiah 61:1*.

On appeal, the plaintiff contends that the trial court erred in determining that its "mission to provide affordable housing" fell within the exclusion to the exemption set forth in § 12-81 (7) (B), and, therefore, improperly concluded that it was not organized exclusively for charitable purposes under the first prong of the *Isaiah 61:1* test. The plaintiff argues that the statutory language is ambiguous and that the legislative history supports its view that there is a distinction between residential properties used for actually "housing" low and moderate income persons, to which it contends the exclusion applies,[13] and its property, which simply "helps facilitate the funding and development of affordable housing," without being a residential facility. The plaintiff further argues that the court, in its interpretation of the statute, improperly applied the language set forth in subdivision (B) of § 12-81 (7) to the language of subdivision (A) of § 12-81 (7), and, in doing so, effectively eliminated the fourth and fifth prongs of the *Isaiah 61:1* test.

The board, in response, contends that the trial court properly interpreted § 12-81 (7) and correctly concluded that the plaintiff's property was excluded from the exemption pursuant to the unambiguous language of § 12-81 (7) (B).[14] The board also argues, however, that, regardless of whether the plaintiff's mission to support affordable housing is a charitable purpose, the undisputed evidence demonstrates that the property is not *used exclusively* for charitable purposes as required under the second prong of *Isaiah 61:1*. Because we agree with the board's contention that the requirement under the second prong of *Isaiah 61:1* is not met, which is dispositive of this appeal, we do not reach the question of whether the plaintiff's mission to support affordable housing is a "charitable purpose" under § 12-81 (7).

II

Whether the property for which an exemption is claimed is "actually and exclusively used for [charitable] purposes" is "an intensely fact-bound inquiry." (Internal quotation marks omitted.) *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 741. In order to satisfy the "exclusive use" requirement of § 12-81 (7), "[a]n institution must be exclusively charitable, not only in the purposes for which it is formed and to which its property is dedicated, but also in the *manner and means* it adopts for the accomplishment of those pur-

poses." (Emphasis in original; internal quotation marks omitted.) Id. A charitable organization must "use its property in such a manner that its activities are *entirely* dedicated to serving its stated charitable purpose." (Emphasis added.) Id., 745.

The following additional undisputed facts provide context for our resolution of this issue. The plaintiff first became involved in energy efficiency loan programs when it provided loan servicing for the Energy Conservation Loan program, which was run by the state and "was income targeted at that point."[15] The purpose of the program was "to decrease energy costs, but more importantly to help homeowners who needed to conduct energy related repairs to their homes to . . . have a source of lower cost capital to be able to do that." There were "very high energy costs . . . [and] the state's concern was that there were people who didn't have access to resources to be able to alleviate some of those costs . . . and needed repairs."

In 2011, the plaintiff created a subsidiary, CEEF Co., "to support energy conservation and load management and clean energy and energy efficiency projects by developing and administering the financing of loans to consumers." The energy efficiency loan programs that the plaintiff currently is involved in, through CEEF Co., support the state's energy conservation plan and are operated under the approval of, or in partnership with, the utility companies and several state agencies and regulatory bodies, including the Department of Energy and Environmental Protection, the Public Utilities Regulatory Agency, the Connecticut Green Bank, and the Connecticut Energy Efficiency Board.

Vinal testified at trial and during his deposition that the plaintiff became involved in administering the statutorily mandated programs after being contacted by Eversource. Eversource initially had selected an out-of-state for-profit bank to run the Home Energy Solutions program, but "the state said to Eversource you need to find a lower cost local source because it was very expensive. The ratepayer money was being exhausted very rapidly." The plaintiff subsequently submitted a proposal and, through a competitive bidding process, a regulatory agency selected CEEF Co. to administer the program. Vinal further testified during his deposition that the plaintiff provided "a very cost effective solution to be able to . . . create the opportunity to meet the state's energy conservation goals and support the companies in doing that."

Currently, the plaintiff, through CEEF Co., is involved in five different energy efficiency loan programs. The utility companies contract with CEEF Co. to provide program administration, marketing, contract network, underwriting and funding of loans. CEEF Co. then contracts with the plaintiff "to do the work," i.e., to provide loan servicing and third-party contract administration

for those companies. The plaintiff provides services such as marketing, intake and processing of applications, managing a contractor network to provide services, monitoring work completion, funding loans, receiving payments, reimbursing funding sources, reporting to funders, and collections of delinquent accounts. Vinal testified that the plaintiff's loan servicing is "really debt collection" and consists of "the collection of required payments from borrowers for loans and then the recordation of that and the distribution of the proceeds to the appropriate sources, whether it's principal and interest, and to the original lender or owner of the loan. It also includes collections or default management which is if they don't make a payment, you have to pursue payment, so you become a debt collector and those are the primary functions."

The energy efficiency loans funded through these programs are made to consumers, commercial entities, and industrial customers. According to Vinal, the plaintiff is essentially a "clearinghouse" that "help[s] people . . . get the best price for the best product that they have." Only one of the programs, the Energy Conservation Loan program, has an income limitation for its loan recipients. The Energize CT Heat Loan program also reserves a portion of its loans to assist persons or families of low and moderate income. For example, during the fiscal year ending March 31, 2020, the plaintiff distributed approximately $17.4 million in loans directed toward the Energize CT Heat Loan program, and only 40 percent of that amount, or approximately $7 million, was intended to assist persons or families of low and moderate income. Otherwise, the programs do not limit income in their eligibility requirements.

On appeal, the board contends, among other things, that the work that the plaintiff does for CEEF Co. related to the energy efficiency loan programs is not charitable. Specifically, the board argues that "[t]he work [the plaintiff] performs is paid by CEEF Co. through those contracts with ratepayer funds. With the exception of one program, there are no limits on income eligibility for these loans. In fact, the loan programs developed under [General Statutes] § 16-245m (d) (1) require the program to be available to all customers of the electric and gas companies. There is nothing charitable about these services." We agree with the board.[16]

We are guided by our Supreme Court's analysis in *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 740–50. In *St. Joseph's*, the plaintiff was a nonprofit skilled nursing facility organized to provide long-term health care to the elderly, without regard to individual financial circumstances. Id., 702, 715–18. Our Supreme Court determined that such a purpose was charitable, and that the plaintiff satisfied the first prong of *Isaiah 61:1*. Id., 718, 739–40. In an attempt to expand

its patient base, however, the plaintiff also offered short-term rehabilitative care to the general public. Id., 706, 741. Our Supreme Court determined that such a use of the property was outside the scope of the plaintiff's charitable purpose and, therefore, defeated the plaintiff's claim for a property tax exemption under the "exclusive use" requirement of § 12-81 (7), as reflected in *Isaiah 61:1*'s second prong. Id., 746–47.

Our Supreme Court reasoned: "[W]e agree with the trial court that the [plaintiff's] provision of short-term rehabilitative services to patients of all ages, drawn from the community at large, is outside the scope of the [plaintiff's] stated purpose . . . . Providing short-term rehabilitative care to the general public, although a necessary service and surely helpful to the [plaintiff's] bottom line, simply cannot be characterized as falling within the [plaintiff's] charitable purpose." Id. The court noted, "[b]y way of example . . . that the [plaintiff] would presumably provide rehabilitative services to a sports superstar, such as Tiger Woods, working to overcome an injury or to recover from surgery. Such services simply cannot be considered charitable in any sense of the word." Id., 747 n.49. Our Supreme Court further explained: "If the [plaintiff] limited its provision of rehabilitative care to its existing population of elderly, long-term residents, we would be inclined to conclude that such services are within the scope of its charitable purpose as expressed in its corporate charter. Alternatively, the [plaintiff] could amend its charter to broaden the availability of rehabilitative services for those elderly persons who are not part of its long-term patient population but who are drawn from the community at large. In such a case, the use of the [plaintiff's] facility in furtherance of that charitable purpose would not defeat a claim for property tax exemption under the exclusive use requirement of § 12-81 (7). The record, however, does not support such a characterization of the [plaintiff's] operation with respect to the rehabilitative services that it advertises and promotes. These services are neither indispensable nor incidental to the [plaintiff's] stated charitable purpose. We conclude, therefore, that the trial court properly determined that the [plaintiff's] property is not used exclusively for its charitable purpose." (Footnote omitted.) Id., 747.[17]

In the present case, the undisputed evidence demonstrates that most of the energy efficiency loan programs administered by the plaintiff benefit consumers, commercial entities, and industrial customers, without the imposition of income limitations or demonstration of financial need. Indeed, at oral argument before this court, counsel for the plaintiff acknowledged that a privately owned, for-profit real estate holding company would be eligible to participate in these energy efficiency programs. Just as the plaintiff in *St. Joseph's* exceeded the scope of its charitable purpose by offering services to "the general public" and "to patients of all

ages, drawn from the community at large," rather than just to the elderly; *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 746–47; that aspect of the plaintiff's business in the present case that focuses on energy efficiency loan programs with no income limitations is distinct from its purpose of providing "financial products and services to support activities that primarily benefit *low and moderate income persons and geographies*," and "promot[ing] energy efficiency and use of alternative energy . . . and other services *benefitting low-and moderate-income persons and geographies*." (Emphasis added.)

The plaintiff nevertheless contends that its work for CEEF Co. related to the energy efficiency loan programs is charitable because it "lessen[s] the burdens of [the] government" by assisting the state in achieving its energy goals and promoting energy efficiency which, in turn, combats climate change. We are not persuaded.

First, although the programs themselves may be designed, at least in part, to promote the state's energy conservation goals and to positively impact the environment, the plaintiff's involvement in the energy efficiency programs is limited to fulfilling financial and administrative needs, as confirmed by Vinal's testimony about the plaintiff's role in providing lower cost capital for the energy efficiency projects and helping program participants "get the best price for the best product that they have." Accordingly, we reject the plaintiff's attempt to broaden the scope of its purpose to encompass governmental climate change initiatives. See *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 740–41 (rejecting plaintiff's attempt to take "a broad view" of its charitable purpose by urging court to conclude that providing short-term rehabilitative care to general public was within charitable purpose of "provid[ing] [health] care" (internal quotation marks omitted)).

Second, although the energy efficiency loan programs are statutorily mandated and state agencies are involved in their regulation, the plaintiff's activities include, among other things, marketing, intake and processing of applications, reporting to investors, and the collection of delinquent accounts for the utility companies. In other words, the plaintiff's services relieve a burden that would otherwise be borne by *the utility companies*, not by the state itself.[18] Indeed, the evidence demonstrates that the plaintiff does not undertake *any* financial burden, given that the loans distributed through these programs are fully funded by the ratepayers themselves. The plaintiff contends that, "without [its] activities, the government could not continue its present program, unless it undertook to [employ] workers itself given that the state has not found any other cost-effective option over the years." Even if the plaintiff provides a more "cost-effective" servicing option for the utility companies, however, nothing in the record

indicates that the programs would no longer be available, especially considering that such programs are statutorily mandated; see General Statutes § 16-245m (d) (1); or that any financial burden would fall on the state, rather than on the utility companies, to administer the programs.

In summary, the plaintiff simply has not demonstrated how the financial services it sells to utility companies, services which include debt collection and the facilitation of loans to consumers, commercial entities, and industrial customers that do not have any income limitations or financial need, are charitable. See *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 730 (exemptions to charitable institutions can be granted only to aid in "the accomplishment of a *public benefit* and for the advancement of the *public interest*" (emphasis added; internal quotation marks omitted)). In addition, the plaintiff failed to demonstrate that these services are indispensable or incidental to its stated purpose.[19] Accordingly, the plaintiff's property is not used *exclusively* for charitable purposes, as required under *Isaiah 61:1*'s second prong. The trial court, therefore, properly dismissed the plaintiff's appeal from the board's decision.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff has "no defined eligibility" requirements for its services.

[2] Banks are incentivized to lend money to community development financial institutions such as the plaintiff because, in return, they receive Community Reinvestment Act credits, which are considered when the banks "seek approval for mergers, acquisitions and/or approval for additional branches."

[3] For loan servicing, the plaintiff charges the banks a fee ranging from $10 to $16 per loan per month in addition to a onetime fee to transfer and set up a portfolio.

[4] CEEF Co., also a tax-exempt charitable organization for federal tax purposes, operates its business at the same location as the plaintiff. As we explain subsequently in this opinion, CEEF Co. has no employees of its own and contracts with the plaintiff to provide its services.

[5] General Statutes § 16-245m (d) (1) provides in relevant part that "electric distribution companies . . . in coordination with the gas companies . . . shall submit to the Energy Conservation Management Board a combined electric and gas Conservation and Load Management Plan, in accordance with the provisions of this section, to implement cost-effective energy conservation programs, demand management and market transformation initiatives. . . ."

[6] According to Calvin Vinal, the plaintiff's president and chief executive officer, the plaintiff "help[s] mostly lower income, minority, and women . . . to develop . . . the [economic] capacity . . . to own and operate or develop a business . . . ."

[7] General Statutes § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation . . . (7) . . . (B) On and after July 1, 1967, housing subsidized, in whole or in part, by federal, state or local government and housing for persons or families of low and moderate income shall not constitute a charitable purpose under this section. As used in this subdivision, 'housing' shall not include real property used for temporary housing belonging to, or held in trust for, any corporation organized exclusively for charitable purposes and exempt from taxation for federal income tax purposes, the primary use of which property is one or more of the following: (i) An orphanage; (ii) a drug or alcohol treatment or rehabilitation facility; (iii) housing for persons who are homeless, persons with a mental health disorder, persons with intellectual or physical disability or victims of domestic violence; (iv) housing for ex-offenders or for individu-

als participating in a program sponsored by the state Department of Correction or Judicial Branch; and (v) short-term housing operated by a charitable organization where the average length of stay is less than six months. The operation of such housing, including the receipt of any rental payments, by such charitable organization shall be deemed to be an exclusively charitable purpose . . . ."

[8] In its pretrial brief, the board questioned: "[G]iven that the actual affordable housing property is not a charitable purpose under § 12-81 (7) (B), how can it be that loaning money for the creation of such noncharitable purpose is charitable under § 12-81 (7) (A)?" The board also acknowledged, however, that its argument "is somewhat a simplistic view of the question," and "assert[ed] that such facts are relevant to framing [the] issue but not to deciding the case."

[9] As we explain subsequently in this opinion, in order for property to qualify for tax exemption under § 12-81 (7), it must "(1) belong to or be held in trust for a corporation organized exclusively for charitable purposes; (2) be used exclusively for carrying out such charitable purposes; (3) not be leased, rented or otherwise used for a purpose other than the furtherance of its charitable purposes; (4) not be housing subsidized by the government; and (5) not constitute low or moderate income housing." *Isaiah 61:1*, *Inc.* v. *Bridgeport*, supra, 270 Conn. 77.

Despite its statutory construction of § 12-81 (7), the trial court determined that the fourth and fifth prongs are "clearly inapplicable" in the present case because "[t]here is no claim that the property is housing as that term is ordinarily understood, nor does the record support such a characterization." (Internal quotation marks omitted.) The court also determined that the third prong is not applicable to this case and, therefore, that its analysis was confined to the first two prongs.

[10] The parties agree that our standard of review over the trial court's decision is plenary. Although we occasionally "review the trial court's conclusion in a tax appeal pursuant to the well established clearly erroneous standard of review"; (internal quotation marks omitted) *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 706; the issue in the present case involves application of the law to the undisputed facts. See, e.g., *Jeweler* v. *Wilton*, 199 Conn. App. 842, 847, 237 A.3d 800 (2020) (where "issue concerns the proper application of [the statute at issue] to undisputed facts, our review of that legal question is plenary").

[11] Because in our consideration of the first two prongs, we dispose of the plaintiff's appeal under prong two, we do not reach the question of whether the remaining prongs are satisfied, or even applicable, in this case. See *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 709 (concluding that third, fourth, and fifth prongs of *Isaiah 61:1* test were inapplicable to that case).

[12] "[O]nly the first factor, i.e., whether the purpose expressed in the organization's fundamental documents, is the sine qua non of a charitable organization. Once a court determines that an organization has an exclusively charitable purpose, the other factors should be considered under the totality of the circumstances to determine whether the organization is, in fact, fulfilling its charitable purpose." *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 713 n.27.

[13] Notably, § 12-81 (7) (B) does not exclude *all* housing for persons or families of low and moderate income from receiving the exemption. Our Supreme Court's recent decision in *Rainbow Housing Corp.* v. *Cromwell*, supra, 340 Conn. 501, makes clear that such housing may still "[fall] within the scope of the charitable exemption . . . if it is 'temporary' and primarily used for one of the five . . . charitable purposes [enumerated in § 12-81 (7) (B) (i) through (v)]." Id., 514. Nevertheless, because we affirm the trial court's judgment pursuant to *Isaiah 61:1*'s second prong, we need not address how, if at all, the exclusion to the exemption set forth in § 12-81 (7) (B) applies to the present case.

[14] The board does not challenge the trial court's determination, under *St. Joseph's* second factor, that the plaintiff is not self-supporting, and that conclusion is supported by the undisputed evidence. The board also does not challenge the trial court's determination, under *St. Joseph's* third factor, that the plaintiff's corporate documents express a purpose which would relieve a burden on society. Instead, the board argues that, in looking at how the property is *used*, pursuant to the second prong of *Isaiah 61:1*, the plaintiff failed to prove that the work it performs for CEEF Co. relieves any burden on the state, which we address in part II of this opinion.

[15] The plaintiff was operating at the time as CT Housing Investment Fund,

Inc. (CHIF). CHIF was incorporated in 1967 and changed its name to Capital for Change, Inc., in 2016, following its merger with the Greater New Haven Community Loan Fund, Inc.

[16] The trial court, in evaluating the second prong of *Isaiah 61:1*, again relied on its interpretation of the exclusion set forth in § 12-81 (7) (B). The court considered Vinal's testimony about the amount of commercial loan funds dedicated to "provide housing for persons or families of low or moderate income" and the energy efficiency loans "specifically intended to assist persons or families of low and moderate income in providing energy efficient heating systems for their homes." The court concluded: "Vinal's credible testimony is dispositive of the case. Loans made for the purpose of providing housing for persons of low and moderate income are not 'peripheral activities' of [the plaintiff]. . . . Such loans are central to its foundational purpose of providing 'housing options' that primarily 'benefit low and moderate income persons.' . . . Under these circumstances, [the plaintiff's property] is not 'used exclusively' for carrying out 'charitable purposes' as that term is defined in . . . § 12-81 (7)." (Citations omitted.) Our determination that the requirements of prong two were not met rests on different grounds. *Lewis* v. *Freedom of Information Commission*, 202 Conn. App. 607, 616 n.9, 246 A.3d 507 (2021) ("[i]t is axiomatic that [w]e may affirm a proper result of the trial court for a different reason" (internal quotation marks omitted)).

[17] Our Supreme Court's conclusion in *St. Joseph's* was indirectly supported by its decision in *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, 258 Conn. 553, 783 A.2d 993 (2001). See *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 743–44. The plaintiff in *H.O.R.S.E. of Connecticut, Inc.*, was an organization dedicated to "the care of all abused, neglected, unwanted and lost domestic hoofed animals; to provide education and training pertinent to the care of hoofed animals for employees, members and officers, and the community as a whole; and to safeguard, advance and promote the safety and well-being of domestic hoofed animals by political, educational and other community activity." (Internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, supra, 556. Although the plaintiff used the subject property, at least in part, to board and to rehabilitate abused, neglected or abandoned horses, certain evidence indicated that at least some of the plaintiff's boarders were "healthy and were not, and never ha[d] been, in need of the special care, treatment or rehabilitation that the plaintiff afford[ed] abused, neglected or abandoned horses in accordance with its charitable purpose." Id., 564. Accordingly, our Supreme Court remanded the case to the trial court, which had granted the plaintiff's motion for summary judgment, to resolve this factual dispute and to determine whether the plaintiff's use of its property was, in fact, dedicated exclusively to its charitable purpose. Id., 565–66.

[18] We also note that providing a service to the government, or relieving a state burden, does not, in and of itself, make an activity "charitable." Instead, the question of whether an organization's activities relieve the state of a burden it would otherwise be compelled to bear is just one factor that "should be considered under the totality of the circumstances to determine whether the organization is, in fact, *fulfilling* its charitable purpose." (Emphasis added.) *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 713 n.27.

[19] The plaintiff asserts, in a conclusory fashion, that its activities for CEEF Co. are "necessary for the primary, tax-exempt purpose." Activities that are " 'necessary for' " the accomplishment of an organization's charitable purpose, or "merely incidental to" such a purpose, do not defeat a claim for tax exemption. (Emphasis omitted.) *St. Joseph's Living Center, Inc.* v. *Windham*, supra, 290 Conn. 745–46. The plaintiff, however, has failed to explain how its financial services for utility companies, which ultimately benefit consumers, commercial entities, and industrial customers without financial limitations, are necessary for, or "indispensable"; id., 743; to the accomplishment of its goal to provide financial products and services to support activities that primarily benefit low and moderate income persons.